**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

September 10, 2022

Honorable Jesse M. Furman
United States District Court Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square,
New York, New York 10007

Re:   *United States v. Tymel Abrams*, S1 21 Cr. 352 (JMF)

Honorable Judge Furman:

I write on behalf of my client, Mr. Tymel Abrams, in advance of his sentencing in the above-captioned case, scheduled for Tuesday, September 20, 2022 at 3:15 P.M. On November 15, 2021, Mr. Abrams took responsibility for his participation in a narcotics distribution conspiracy in which a gun was present, pleading guilty to Counts 1 and 2 of the 2021 Superseding Indictment in this matter.

Only 22 years old at the time of the offense, Mr. Abrams had by that time already been strung out on hard drugs for years. Though hardly a kingpin, Mr. Abrams now faces a mandatory ten years in prison. In the February 2, 2022 Presentence Investigation Report (PSR), the Probation Department recommends a breathtaking sentence of 181 months—a term at the bottom of the applicable range of the advisory United States Sentencing Commission Guidelines, but one amounting to far more punishment than is necessary to satisfy the objectives of Title 18 U.S.C. 3553(a).

Surely, no prison sentence will ever solve—or even meaningfully address—the drug addiction that has been ravaging Mr. Abrams's young life. The sheer scale of it is striking: By the time of his arrest, Mr. Abrams was subjecting himself every day to continuous doses of opiates, marijuana, and "lean", likely Codeine-Promethazine cough syrup. *See* PSR ¶¶ 32, 64. Just sustaining that level of consumption was a job in itself, one inextricably intertwined with Mr. Abrams' offense.

While Mr. Abrams holds himself entirely accountable for his actions, it is also clear that he did not choose addiction. It has cost him far more than his liberty and gained him nothing but misery. He began using marijuana at an impossibly young age, use that became apparent to his mother by the time he was 12 or 13 years old. *See* PSR ¶ 64. That use did little to forestall ███████████████████████████████████████
████████████████████████████████████████████████████████ ever since. *See* PSR ¶ 62.

But Mr. Abrams' life took a fateful turn when he first tried opiates. From that day forward, Mr. Abrams used what he thought was Percocet every day. *See* PSR ¶ 64. It was

probably fentanyl. *Id.* Persistent intoxication corroded his judgment. Selling enough pills to pay for his own growing habit, Mr. Abrams used social media to announce when he had drugs to sell. *See* PSR ¶ 24. Law enforcement took notice. When the NYPD targeted him for a series of undercover buys of dramatically increasing quantities of pills[1], Mr. Abrams was not difficult to find. *See* PSR ¶¶ 13-24.

Since his arrest on July 2, 2020, Mr. Abrams has been held at the Metropolitan Detention Center in Brooklyn. His detention overlaps with some of the most difficult years of that troubled institutions' history. For years, Mr. Abrams constantly has been subject to seemingly-random lockdowns and unexplained deprivations of basic necessities. In close, airless quarters, under the relentless shadow of a deadly global pandemic, Mr. Abrams has been cut off even from the most fundamental incidents of ordinary life, like sunlight. *See* PSR ¶ 61. He has never had a contact visit with his loved ones. The brutal conditions to which he has been relentlessly subjected ███████████████████████████████████.

Yet, there is cause for hope. Mr. Abrams is beginning a long process of recovery. As he emerges, he finds that his family is there to support him. The public interest—and Mr. Abrams's very future—depends on the strength of these bonds. On his behalf, I respectfully urge the Court to impose a sentence of not more than 120 months. Ten years in prison is a severe and punishing rebuke, one that is more than sufficient to achieve the statutory goals of sentencing.

## I.　　Causes and Effects

Tymel Abrams was born in Brooklyn to Ms. Akia Langhorne and Mr. Jamal Abrams. *See* PSR ¶ 53. The oldest by several years, Mr. Abrams grew up with his two younger siblings, Jamal and Elijah, and his mother in a single-parent household. Mr. Abrams' father was never a stable presence. It was not until Tymel was older that he realized his father was incarcerated. For Ms. Langhorne's part, trying to provide single-handedly for a household of four meant long hours at work. This, in turn, meant Mr. Abrams supervising and caring for his younger brothers, with little supervision of his own. *See* PSR ¶ 55.

Despite these challenges, Mr. Abrams managed to stay in school. He was good at it. When his family briefly moved to Virginia after he finished the eighth grade, Mr. Abrams excelled as a student. He enjoyed classes like Spanish because he knew that what he was learning would help him later in life. He also found companionship and success in sports.

---

[1] Before the run of undercover buys, Mr. Abrams sold small quantities of drugs to pay for his own use. The first undercover buy, in February 2020, was for 20 pills in exchange for $200. *See* PSR ¶ 13. In response to the undercover's persistent request for larger quantities, it grew far more lucrative. By May 5, 2020, Mr. Abrams was struggling to come up with the 500 pills the undercover officer wanted in exchange for approximately $3,600. *See* PSR ¶¶ 20, 21. A week later, in exchange for approximately 1,250 pills, the undercover officer paid Mr. Abrams $7,000.

| | | |
|---|---|---|
| Honorable Jesse M. Furman | *U.S. v. Tymel Abrams* | September 10, 2022 |
| Southern District of New York | 20 Cr. 352 (JMF) | Page 3 |

In his first year of high school, Mr. Abrams played lacrosse, football, and basketball. *See* PSR ¶ 66.

But his family moved back to Brooklyn. Here in the City, structured extra-curricular activities gave way to resumed marijuana use and aimless socializing. Mr. Abrams' studies foundered as he struggled to stay focused. Though he was persistent and eventually earned a diploma, *see* PSR ¶ 65, Mr. Abrams would have to repeat a grade. Along with his academic performance, Mr. Abrams' ███████████████████████ *See* PSR ¶ 62.

There likely was more to the picture than that for which a loss of structure alone accounts. The age of onset for nearly half of mental health disorders is 18.[2] ███████████████████████████████████████████ It is well settled that maturation of brain structure, function, and connectivity continues well into the early twenties.[3] A maturing the brain is still developing executive functioning, or the skills related to impulse control, self-awareness, future-oriented decision-making, and perspective.[4] Research suggests that young adults often engage in *riskier* behavior than adolescents during characteristic "period[s] of vulnerability…marked by significant changes in environment and personal development."[5] Disconnected from his previous successes in Virginia, he lost a positive sense of his own purpose at a time when he was most vulnerable to impulsive behavior.

Mr. Abrams' drug abuse did not help him develop. His marijuana use increased, and he began abusing much harder drugs—opiates and "lean", an addictive drug with dissociative effects—when he was 19. *See* PSR ¶ 64. It would only be a few months after he started abusing those drugs before Mr. Abrams picked up his first conviction. *See* PSR ¶ 46. Another would soon follow. PSR ¶ 47.

By the time his offense conduct in this case began, Mr. Abrams undeniably was in a full-blown crisis of spiraling drug abuse. He used far more than required to maintain a habit. Instead, he was keeping himself intoxicated. To obtain the drugs he abused, Mr. Abrams sold what drugs he could find, whenever he could. He was not a cunning, sophisticated, or even careful drug dealer. Using his own social media account, Mr. Abrams announced when he had pills for sale. This soon attracted the attention of law enforcement.

---

[2] *See* Solemi, M, *et al*, *Age at onset of mental disorders worldwide: large-scale meta-analysis of 192 epidemiological studies*, Molecular Psychiatry, 27, pp. 281-295 (2022).

[3] *See* Leah Somerville, *Searching for Signatures of Brain Maturity: What Are We Searching For?*, 92 Neuron 1164, 1164-67 (2016).

[4] *See* Blakemore, S.J. and Choudhury, S. *Development of the Adolescent Brain: Implications for Executive Function and Social Cognition*, Journal of Child psychology and Psychiatry, 47, pp. 296-312. (Feb. 2006).

[5] Taber-Thomas, B. and Perez-Edgar, K. *Emerging Adulthood Brain Development*, Oxford Handbooks Online, (Nov. 2014), p. 7.

| | | |
|---|---|---|
| Honorable Jesse M. Furman | *U.S. v. Tymel Abrams* | September 10, 2022 |
| Southern District of New York | 20 Cr. 352 (JMF) | Page 4 |

Meanwhile, his mother tried to get him enrolled into rehab, but the onset of the coronavirus pandemic stopped those efforts cold. *See* PSR ¶ 64. He would continue to use and sell drugs to the undercover until his arrest on July 2, 2020, about six weeks after he turned 23 years old.

### II.   Moving Forward

Although his young adult life has been troubled by mental illness and addiction, Mr. Abrams is also capable of resilience. He wants to the break the cycle of incarceration and instability for his family and is eager to undertake any and all programming that can be made available to him. Nothing is or has been available at the MDC since before the pandemic erupted. But Mr. Abrams has shown that he will work to better himself if given the opportunity, as he did when he earned his OSHA 30-hour certificate while incarcerated in 2018. *See* PSR ¶ 66.

Mr. Abrams' family and loved ones also support him. They know him to be a "nice, smart, generous, and a very caring person" who has shown himself to be "loving and dependable[.]" PSR ¶ 56. He is a dependable brother and a beloved son whose family knows him to be "a good person who is helpful" at home. PSR ¶ 57. He has potential, and there is still hope that he can turn his life around.

### III.   Coming to Grips with Reality.

Mr. Abrams can find his way back, but the hardest work belongs to him alone. He must believe himself worth the struggle. Federal detention has done nothing to restore Mr. Abrams to his sense of self-worth. Adding to his mandatory term of imprisonment won't cure his addiction ▮▮▮▮▮▮▮▮▮▮ coextensive with it. Worse, it is likely to be counterproductive. The harsh environment in prison has no place to undertake recovery.

But it is also perfectly clear that Mr. Abrams' personal desire to break out of his addiction, ▮▮▮▮▮▮▮▮▮ and to restore his life's potential aligns exactly with the public's interest in preventing further recidivism. He has the love and support of his family, and with their help, he is finally liberating himself from the past. Therein lies the hope for his future.

### IV.   Considering of the Statutory Factors Supports a 120-Month Sentence.

The Court is entirely familiar with the legal standard governing sentencing. Since *United States v. Booker*, 534 U.S. 220 (2005), both the United States Supreme Court and the Second Circuit have stressed that a sentence must be based upon an individualized analysis of the particular characteristics of the defendant and his crime.

Whereas there is no utility in additional punishment, there is everything to gain from safely restoring a sober Mr. Abrams to the love and support of his family. It is essential to his recovery. Indeed, it is impossible to overstate the centrality of their role. Because they

| | | |
|---|---|---|
| Honorable Jesse M. Furman | *U.S. v. Tymel Abrams* | September 10, 2022 |
| Southern District of New York | 20 Cr. 352 (JMF) | Page 5 |

can see his growth, they are all—individually, and as a unit—dedicated to helping him. They have a place and a valued role for him:

Even this priceless support would be in vain if it were lost on Mr. Abrams that he needs to change his life. Thankfully, it isn't. Following through on that insight requires courage. But there is, perhaps, no clearer evidence of Mr. Abrams' potential for growth or his capacity to recover than the fact that he is willing to face his addiction. He spent a very long time in denial. That is no longer true, and it makes a world of difference. He is genuinely remorseful, and the brutal, painful years he has spent at the MDC have driven home hard lessons.

Mr. Abrams wants the Court to know that has no intention of ever committing another crime. He knows he has wasted too much of his life already. And though he is feeling the separation from his family, he has not given up hope in himself. He respectfully asks the Court for the earliest chance to prove himself.

### V.    Conclusion

In imposing sentence, the Court is guided by the overarching "parsimony principle" of § 3553(a), which calls for the Court to impose a sentence 'sufficient, but not greater than necessary' to accomplish the goals of sentencing." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006)(directing district courts to impose the lowest sentence necessary to achieve the ends of sentencing). Applying the § 3553(a) factors to Mr. Abrams's individual circumstances, a 120-month sentence affords sufficient punishment. There is no utility in any additional punishment.

For all the reasons discussed above, it is respectfully requested that the Court sentence Mr. Abrams to not more than 120 months of incarceration.

Thank you for considering this request.

Respectfully submitted,

Christopher A. Flood
Assistant Federal Defender
Counsel for Mr. Tymel Abrams

cc: Thomas John Wright, AUSA